Joseph J. SCHULTZ, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Robert E. Gray, Intervenor.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GRAND UNION COMPANY, Respondent.

Robert E. Gray, Intervenor.

Nos. 15238, 15303.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 3, 1960.

Decided Sept. 15, 1960.

Mr. Harry Pozefsky, Gloversville, N. Y., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Herbert S. Thatcher, Washington, D. C., was on the brief, for petitioner in No. 15,238.

Mr. Frederick U. Reel, Attorney, National Labor Relations Board, with whom Messrs. Thomas J. McDermott, Associate General Counsel, National Labor Relations Board, and Marcel Mallet-Prevost,

Assistant General Counsel, National Labor Relations Board, were on the brief for respondent in No. 15,238 and petitioner in No. 15,303.

Mr. Robert H. Jones, III, Albany, N. Y., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Thomas E. Shroyer, Washington, D. C., was on the brief, for intervenor.

No appearance was entered for respondent in No. 15,303.

Before WASHINGTON, DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

These cases are before this court on the petition of Joseph J. Schultz to review and modify or set aside an order of the National Labor Relations Board (No. 15,238), and on petition of the National Labor Relations Board to enforce that order against The Grand Union Company, hereinafter referred to as the Company (No. 15,303). Pursuant to Rule 38(k) of this court, 28 U.S.C.A., the parties, with the approval of this court, have stipulated the facts and issues following.

On January 17, 1957, Robert E. Gray filed with the National Labor Relations Board a petition under Section 9(c) of the National Labor Relations Act, 29 U.S.C.A. § 159(c), hereinafter referred to as the Act, in which he sought to be certified as the statutory bargaining representative of the employees in the Waterford, New York, warehouse of The Grand Union Company. Local 294 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, intervened, likewise seeking certification as bargaining representative of these employees. The Board thereupon directed and conducted an election to determine which, if either, the employees wished to be their collective bargaining representative. The employees were thus afforded the choice of Robert E. Gray, Local 294 or neither. Upon Gray obtaining a majority of the votes, he was, on August 19, 1957, certified by the Board as the bargaining representative of the employees.

On September 23, 1957, the Company and Gray executed a collective bargaining agreement which embodied therein a union security clause under Section 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (3). This clause, which is set forth in paragraph 1(b) of the agreement provides:

"Each employee, as a condition of employment, will thirty (30) days after his employment, or the effective date of this agreement, whichever is later, designate Robert E. Gray as his representative for collective bargaining purposes and shall continuously maintain said designation. On written notice from the representative that an employee who has been employed for more than thirty (30) days has failed to tender the periodic dues required as a condition of maintaining said designation, the Employer will discharge said employee within seven (7) days after receipt of such notice unless within such seven (7) days such employee's failure to make such designation or to tender such dues is cured."

At the time of the agreement, Gray had not filed the various documents required by Sections 9(f), (g) and (h) of the Act. These sections have since been repealed and Section 8(a) (3) has been amended by eliminating the requirement of compliance with those subdivisions of Section 9. Accordingly, the Board has moved to dismiss as moot its petition for enforcement, based on failure to comply with Section 9 (No. 15,303).

Subsequently, based upon charges filed by Joseph J. Schultz, a Grand Union employee, petitioner in No. 15,238, the Board's Regional Office issued a complaint against the Company alleging, in material part, that it violated Sections 8(a) (1) and (3) of the Act by executing with Gray the collective bargaining agreement containing the union security clause, since Gray was not a "labor organization" within the meaning of Section 2(5), 29 U.S.C.A. § 152(5). (See *infra*) and 8(a) (3) of the Act.

In his Intermediate Report the trial examiner concluded that Gray was not a labor organization within Sections 2(5) and 8(a) (3) and therefore the Company, by entering into, maintaining and enforcing its agreement with Gray, had violated those sections. The Board, however, upon reviewing the entire proceeding, concluded, in material part, that Gray was in fact a labor organization within both Sections 2(5) and 8(a) (3).

Throughout the Act it is quite apparent from the manner in which the terms "individual" and "labor organization" are disjunctively used that the drafters attempted to avoid confusion in the application and coverage of those terms. Thus in Section 2(1) the term "person" is defined as including "one or more individuals, labor organizations, * * *." Section 2(4) defines "representatives" as including "any individual or labor organization." Section 8(d), wherein Congress defines the scope of the obligation to bargain collectively, again evidences the intention to distinguish the terms by referring to each separately. In Section 9(c) (1) (A), which authorizes both individuals and labor organizations to file either a petition for certification or decertification, it is provided that the petition may be filed "by an employee or group of employees or any individual or labor organization acting in their behalf." Again in Section 9(c) (1) (A) it is provided that a petition for decertification may be filed where it is alleged "that the individual or labor organization which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative." Further, in Section 9(c) (1) (B), which authorizes an employer to institute a representation proceeding, again a distinction is drawn between the terms.

Finally, further evidence of Congress' intention to distinguish the terms is found in the legislative history of Section 303 of the Labor Management Relations Act, 29 U.S.C.A. § 187, which section parallels Section 8(a) (3). Upon introducing this amendment, Senator Taft stated:

"The word 'person' in line 2 will be changed to read 'labor organization', so that suits in secondary boycotts may be brought only against labor organizations and not against individuals." (93 Cong.Rec. 4843, Leg.His., op. cit. p. 1365)

Section 2(5) of the Act defines the term "labor organization" as follows:

"(5) The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, *in which employees participate* and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." (Emphasis supplied.)

In light of the fact that Congress chose to omit the word "individual" from the definition of "labor organization" and the frequency with which both terms are disjunctively used throughout the Act, a clear intention on the part of Congress to exclude the individual is indicated, at least insofar as the broad definition is concerned.[1] Further, the phrase "in which employees participate" contemplates the group as a whole participating in the formulation of policy and procedures to be carried out in the organization, thus providing a democratic form of organization wherein the members have full voice and power to enforce their views.

We are, therefore, left with the single issue of whether the Board properly determined that Robert E. Gray, an individual, was a "labor organization" as the latter term is used in Section 8(a) (3) of the Act.[2]

1. See Bonnaz, Hand Embroiderers, etc. v. National Labor Relations Board, 1956, 97 U.S.App.D.C. 234, 230 F.2d 47.

2. 29 U.S.C. § 158. *Unfair labor practices*
 (a) It shall be an unfair labor practice for an employer
 * * * * *
 (3) by discrimination in regard to hire or tenure of employment or any term or

As the Board recently stated in the Keystone Coat, Apron & Towel Supply Company case:[3]

"We do not believe that it will be burdensome upon any party for the Board to insist upon compliance with the congressional policy as reflected in the union shop proviso of Section 8(a)(3) of the Act. This provision is among the most carefully considered and completely defined elements of the policy embodied in the Taft-Hartley Act."

Thus, in the light of the fact that this section was so closely scrutinized, it seems quite apparent that it was the intent of Congress to exclude the individual from its application. Furthermore, in the light of this "most carefully considered" section, Congress, should it have wished to make it applicable to both entities, would have alluded to neither and have chosen the term "representatives", which as defined in Section 2(4) "includes any individual or labor organization."

An examination of other language used in Section 8(a)(3) further supports this view. Such words as "membership therein" and "acquiring or retaining membership" seems unquestionably to exclude an individual from the application of this section.

Citing South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 259, 60 S.Ct. 544, 549, 84 L.Ed. 732, in which the Supreme Court quoted from its opinion in Warner v. Goltra, 293 U.S. 155, 158, 55 S.Ct. 46, 79 L.Ed. 254, the Government aptly points out that statutes "must be read in the light of the mischief to be corrected and the end to be attained."

The power which Congress has afforded labor organizations under this section is unquestionably great. Whether an employee retains his right to work or not is dependent upon his performance of the conditions of the union security clause executed between the labor organization and the employer. Hence, if he refuses to designate the labor organization as his collective bargaining agent or to pay such organization the dues assessed, the employee is subject to summary dismissal from his employment. Obviously then, great caution must be exercised in the granting of such power. Where a union, unlike an individual, is bargaining representative, the union security agreement entered into is between the employees, who in reality are the union, and the employer. However, where the bargaining agent is an individ-

condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with section 159(f) (g), (h) of this title, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

3. 121 N.L.R.B. 880, 884.

ual, a single entity, and such an agreement is executed, the real parties to the agreement are the individual and the employer.

In the case before us, Gray has set up a structure whereby the employees would elect stewards and trustees to assist him in discharging his duties as bargaining agent. Dues collected are said to be deposited by Gray in a separate bank account and used for organization and representation purposes, etc., as authorized and approved by the employees or the joint administrative board composed of the stewards and trustees. Under such a structure it may be that Gray stands in a fiduciary relationship to all employees of the organization and thus perhaps may be controlled by the courts and perhaps the Board for a breach of the trust owed by him. However, grave problems arise regarding the mechanics of initiating any censure or penalty and for all practical purposes workable standards for control are practically nonexistent. With unions, on the other hand, formalized standards are available to protect the employees such as are found in the constitution and by-laws of the union and in the statutes and decisions of our courts.

Further, a true organization within the meaning of the statute has permanency and continuity. An individual is mortal: subject to illness and disability. Forcing him to account, or to take particular action desired by the employees, might be thwarted by his death or his mental or physical incompetence. Within the structure of an organization, duties and responsibilities can be distributed—a system of checks and balances can be set up. Amounts received as dues are, ideally at least, handled and accounted for on a basis which is designed to devote them to the good of the entire employee group. This is difficult indeed if dues are paid to an individual with no clear directive as to what he should do with them. For these reasons, any suggestion that there is present here a real "labor organization" created by the employees, and that they selected Mr. Gray to represent that organization, seems untenable on this record.

Upon concluding that an "individual" was not encompassed within the meaning of "labor organization" as that term is used in Section 8(b) (4) (C), this court stated, in Bonnaz, Hand Embroiderers, etc. v. N. L. R. B., supra at page 48 of 230 F.2d:

"[The] plain meaning [of the term 'labor organization'] does not, in the present case, produce an absurd result or one plainly at variance with the policy of the legislation as a whole."

We believe such to be true also in the reading of Section 8(a) (3). On the contrary, should we give to the term "labor organization" the interpretation urged by the Board, it would inevitably "produce an absurd [and dangerous] result [and] one plainly at variance with the policy of the legislation as a whole."

■ We have not overlooked the fact that the word "individual" may be encompassed within the meaning of "labor organization" as the latter term is used in certain other sections of the Act not here in issue. As the Supreme Court said in Atlantic Cleaners & Dyers, Inc. v. United States, 1932, 286 U.S. 427, 433, 52 S.Ct. 607, 606, 76 L.Ed. 1204:

"Most words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section. * * * Where the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, * * * the meaning well may vary to meet the purposes of the law * * *.

"It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Leg-

islature intended it should have in each instance."

Thus, in viewing the term "labor organization" as it is used in sections of the Act, we must apply the definition which best serves to carry out the intentions and purposes of the act. In the case of the sections involved in this proceeding, we believe we are "giving to the word the meaning which the Legislature intended it should have."

■ To conclude: Section 8(a) (3) of the Act provides that it shall be an unfair labor practice for an employer—by discrimination in regard to hire or tenure of employment or any term or condition of employment—to "encourage or discourage membership in any labor organization," except as permitted by the provisos to the section (see note 2, supra). Here, the trial examiner found that the company had violated the Act by discouraging membership in any union which might wish to displace Gray. It did this, he said, by forcing the employees to pay dues to Gray. Certainly, no employee would pay dues to a union if he was already paying them to Gray. The trial examiner concluded that the security clause in Gray's contract was not justified by the proviso to Section 8(a) (3), because Gray was not a labor organization. We think that the examiner was correct in this view, and that the Board erred in reversing his decision.

Case No. 15,238 will be remanded to the Board for further proceedings consistent with this opinion.

Case No. 15,303 will be dismissed.

DANAHER, Circuit Judge (dissenting).

Had Teamsters Local 294 been selected as the bargaining representative, it clearly would have been authorized to enter into the security agreement before us. The Act, 29 U.S.C.A. §§ 158(a) (3) and 158(b) (2), permits such an arrangement. Radio Officers v. National Labor Relations Board, 1954, 347 U.S. 17, 40, 41, 42, 74 S.Ct. 323, 98 L.Ed. 455.

But Local 294 lost the election. The employees had a choice and they selected as their bargaining representative, Robert E. Gray. The Board certified Gray. It said he is a "labor organization" and that he might lawfully have entered into the support agreement if only he had complied with the requirements of section 159(f), (g) and (h) of the Act.[1] The Company, however, stands charged with committing an unfair labor practice for entering into the agreement which the employees and their bargaining representative demanded.[2]

Normally, we "should affirm [the Board's] definition if that definition does not appear too farfetched. [National] Labor [Relations] Board v. Hearst Publications, Inc., 322 U.S. 111, 130 [64 S.Ct. 851, 88 L.Ed. 1170]." National Labor Relations Board v. Coca-Cola Bottling Co., 1956, 350 U.S. 264, 269, 76 S.Ct. 383, 386, 100 L.Ed. 285. But, like my colleagues, I am not convinced by the Board's opinion that Gray is a "labor organization" within the meaning of 29 U.S.C.A. § 152(5). I see no statutory basis for, or contributing legislative history which requires such an unnatural construction.[3]

1. This asserted basis for the Board's order has been rendered moot because of the repeal provision of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 525, 29 U.S.C.A. § 159(f)–(h) (Supp. I, 1959).

2. The Company was bound to bargain in good faith as to "wages, hours and other terms and conditions of employment." National Labor Relations Board v. Wooster-Division of Borg-Warner Corp., 1958, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823.

3. We have hitherto rejected any such strained interpretation, in different factual context, to be sure, and with reference to a different section of the Act, viz.: 29 U.S.C.A. § 158(b) (4) (C). Bonnaz, Hand Embroiderers, etc. v. National Labor Relations Board, 1956, 97 U.S.App.D.C. 234, 230 F.2d 47. And see opinion of Board member Jenkins in the Grand Union Company Case, 123 N.L. R.B. 1673 (1959).

Much of our present difficulty arises from the fact that the charge, the complaint, the hearing and the opinions of the various Board members, all involved the concept of Gray as a labor organization. The record only partially presents the picture of what the employees actually did, or sought to do. It seems to me that the employees here created their own labor organization. When this case was before the Board, 29 U.S.C.A. § 152(5) defined "labor organization" to be "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." [4] This employee organization falls well within the broad language of the Act. National Labor Relations Board v. Kennametal, Inc., 3 Cir., 1950, 182 F.2d 817, 19 A.L.R. 2d 562; and see National Labor Relations Board v. General Shoe Corp., 6 Cir., 1951, 192 F.2d 504, certiorari denied 1952, 343 U.S. 904, 72 S.Ct. 635, 96 L.Ed. 1323.

The Wagner Act expressly declared as national policy that workers were to possess full freedom of association, self-organization, and designation of representatives [5] of their own choosing. As to such basic essentials, the Taft-Hartley Act made no substantial change.

Thus, the employees here had the right to "self-organization," to join or not to join a labor organization, and "to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

What was done here precisely conforms to what the Act says are the rights of the employees. They formed a liaison committee including five stewards with employee representation from different departments and from day and night shifts. The committee met regularly, at least once a week, with Gray, receiving contract proposals for negotiation, complaints for grievance processing, and production suggestions. In turn, and as to such subjects, the committee with Gray met for conferences and discussions with management representatives. The stewards committee and Gray regularly, on the first Wednesday of each month, met with management to canvass mutual problems. The employees also elected four Trustees for fiscal supervision of Gray's representation operations. These Trustees with the stewards constituted a joint administrative board with the chief steward as board chairman. One Trustee was elected Treasurer and another, Secretary.

The employees met to select a contract negotiation committee, and again, to consider and ratify the contract as negotiated with the company. At a general meeting, the membership voted to adopt the stewards' recommendation that dues of $2 per month be collected and that Gray be authorized to execute a bargaining agreement as of September 23, 1957, which he did. [6] That the employees exercised their section 7 rights to self-organization and engaged in furthering a plan for their mutual aid and protection is beyond doubt on this record. [7] They must

---

4. The Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, in § 3(i) defines "labor organization" to mean "a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment * * *." 29 U.S.C.A. § 402(i).

5. 29 U.S.C.A. § 157.

6. He was bound so to act as the exclusive bargaining representative of all the employees. 29 U.S.C.A. § 159(a). Of course, he signed as an *individual*, but it was the agreement of the employees. Cf. United States v. Ryan, 1956, 350 U.S. 299, 302, 76 S.Ct. 400, 100 L.Ed. 335.

7. Cf. National Labor Relations Board v. Drivers, Chauffeurs, Helpers, Local Un-

have been fully aware of the possibility that "free riders" might seek to avail themselves of the benefits of their mutual organizational effort and the agreement which had been worked out in their behalf.[8] Their agreement demonstrates an awareness of the necessity for support of their program and to meet the expenses of their representation plan.

The agreement in part read:

"Provided the employee has given written authorization, the Employer agrees to deduct from the employee's earnings a sum equal to the amount of the employee's monthly dues and to remit the same to the Representative by the 15th day of the month following the month in which dues were deducted.

"The employee's authorization for deduction of dues shall be in written form meeting legal requirements irrevocable for a period of one year from the date of said authorization or until the expiration of this agreement, whichever occurs sooner * * *."

The check-off plan as adopted seems to comport fully with the proviso of section 302(c) (4) of the Act, 61 Stat. 157, 29 U.S.C.A. § 186(c) (4) which reads: "*Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner."

We do not have the agreement as a whole before us. The Board has supplied no findings as to the background leading up to Gray's certification. We have but scant information as to the genesis of the agreement adopted by the employees *before* they authorized it to be signed in their behalf by Gray.

We have no evidence that the employer here has actually discriminated against anyone.[9] There is no evidence that Schultz, the charging party, has been "discouraged" from joining the Teamsters or from working in its behalf. There is no suggestion that there is any other person similarly situated. There is no evidence that any employee has been discharged. Cf. Colgate-Palmolive-Peet Co. v. National Labor Relations Board, 1949, 338 U.S. 355, 360, 70 S.Ct. 166, 94 L.Ed. 161. There is no proof of the employer's bad faith or that it had a purpose to discriminate. Yet the employer's purpose is deemed to be "controlling," the Supreme Court has said. Radio Officers v. National Labor Relations Board, 1954, 347 U.S. 17, 44, 74 S.Ct. 323, 98 L.Ed. 455, and to the extent that the latter case may here be authority for Board inferences, the Board has concluded that the agreement, *as such*, is lawful, having in mind all factors and circumstances. There is no claim that the "labor organization" created by the employees here fails to represent the overwhelming majority of the employees who refused to select the Teamsters as their bargaining representative.

When the employees voted, and by their agreement made clear their intention, to continue to designate Gray during the certification year, they did no more than the Act itself does. Brooks v. National Labor Relations Board, 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125. When they voted for the check-off and approved its inclusion in their agreement, they exercised their section 7 rights to bind the minority as well as themselves. When the employees voted for and the Board certified Gray, he became bound to represent all employees in the unit. Hughes Tool Co. v. National Labor Relations Board, 5 Cir., 1945, 147 F.2d 69, 74, 158 A.L.R. 1165. When the em-

---

ion, 1960, 362 U.S. 274, 282, 80 S.Ct. 706, 4 L.Ed.2d 710.

8. Congress knew of the possibility of "free riders" in such situations. Radio Officers v. National Labor Relations Board, 1954, 347 U.S. 17, 41, 74 S.Ct.

323, 98 L.Ed. 455; compare the American Seating Company Case, 98 N.L.R.B. 800 (1952).

9. Cf. N. L. R. B. v. American Dredging Company, 3 Cir., 1960, 276 F.2d 286, petition for certiorari filed.

ployees voted to impose dues, they did so "for organization and representation purposes: to defray operating expenses, etc. (e. g., disbursements to National Labor Relations Board representation and unfair labor practice proceedings), as authorized and approved by the membership or the joint board as the case may be." Such funds were to be disbursed from a special bank account "so far as the employees are concerned, on prior authorization by the joint board."

The employees voted for Gray to represent the organization which they, themselves, created. To all intents and purposes their lawyer, Gray, was a part of it. That the employees' labor organization negotiated, spoke, and acted through Gray, United States v. Ryan, 1956, 350 U.S. 299, 302, 76 S.Ct. 400, 100 L.Ed. 335, in no way detracts from the ultimate, practical fact, as I see it: The agreement was that of their own "labor organization."

If it was, I see nothing in section 8(a) (3) or elsewhere in the Act which forbids such an agreement by an agency shop. Congress did not speak of *unions* as such, but of labor organizations. When Congress barred the closed shop because of certain abuses by *some* unions, it had no occasion to strike down maintenance or support plans of other entities which qualified as labor organizations.[10] Where formerly an advance election was required to authorize a "union-shop" agreement, Congress by the Act of October 22, 1951, 65 Stat. 601, 29 U.S.C.A. § 158 (a) (3), dispensed with the necessity for such elections. It seems certain that Congress left it to the employees themselves, not only to have entered into such an agreement, but to rescind it by majority vote when an election for that purpose shall have been instigated by the petition of 30 per centum of the employees. 29 U.S.C.A. § 159(e) (1) and (2). There is no suggestion on this record that 30 per centum of the em-

ployees or any other group has sought to rescind the agreement which my colleagues would strike down. Only by the action of the employee Schultz, a Teamster, has there been a challenge.

I have said enough to demonstrate why I think this case should be returned to the Board. I think a further hearing should be ordered that the Board may then determine whether or not the agreement here is the agreement of the "labor organization" created by these employees. If it be so found, this employer and the labor organization are bound pursuant to 29 U.S.C.A. § 185(b).

On this record, the employer should not be deemed guilty of an unfair labor practice.

---

10. Indeed, certifications of individuals are rare. United States v. Ryan, supra note 6, 350 U.S. at page 301, note 3, 76 S. Ct. at page 402. Is it to be assumed that privileges of employee-selected forms of labor organization are barred though not proscribed? Cf. Id., 350 U.S. at page 302, 76 S.Ct. at page 403.